AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

TERRY LYNN COOPER,

Defendant.

Case No.

19 MJ00454

FILED
CLERK, U.S. DISTRICT COURT

FEB 12 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of January 19, 2019, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1708 | Possession of Stolen Mail |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

James Keenan, U.S. Postal Inspector, USPIS
Printed name and title

Sworn to before me and signed in my presence.

Date: 2/12/19

CHARLES F. EICK
Judge's signature

City and state: Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
Printed name and title

## AFFIDAVIT

I, James Keenan, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against TERRY LYNN COOPER ("COOPER") for a violation of Title 18, United States Code, Section 1708 (Possession of Stolen Mail).

2. This affidavit is also made in support of an application for a warrant to search six digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the United States Postal Inspection Service, in Los Angeles, California, as described more fully in Attachment A-1.

3. This affidavit is also made in support of an application for a warrant to search the person of COOPER, as described more fully in Attachment A-2.

4. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1708 (Mail Theft and Possession of Stolen Mail), 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Access Device Fraud), 1344 (Bank Fraud), 1028A (Aggravated Identity Theft), 471 (Making, Forging, Counterfeiting or Altering Federal Reserve Notes), and 472 (Passing, Attempted Passing, or Possession of Counterfeit Federal Reserve Notes) (collectively, the "Subject Offenses"), as described more fully in Attachments B-1 and B-2.

Attachments A-1, A-2, B-1, and B-2 are incorporated herein by reference.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

6. I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since June 2015. I am currently assigned to the Los Angeles Division Mail Theft Team, which investigates crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail, fraud, and related activity in connection with access devices (including credit and debit cards), identity theft, and unauthorized use of personal identifying information. I completed a twelve-week basic training course in Potomac, Maryland. That course included training in the investigation of identity theft by those stealing from, and using, the United States mail system. Before becoming a Postal Inspector, I worked as a Customs and Border Protection Officer at the San

Ysidro Port of Entry for approximately three years.  I also completed a six-month basic training course at the Federal Law Enforcement Training Center.  Through my discussions with other Postal Inspectors, I have learned additional information about mail theft investigations and common mail theft and identity theft practices, as well as the use of digital devices in committing related crimes.

### III. SUMMARY OF PROBABLE CAUSE

7.   At approximately 3:40 a.m., on January 19, 2019, Los Angeles Police Department ("LAPD") officers stopped COOPER, who was riding a bicycle without a front headlight.  During a patdown search of COOPER for weapons, an LAPD officer felt a large stack of plastic cards in COOPER's rear right pocket.  COOPER consented to the search of his backpack by the LAPD officers.  Inside the backpack, the LAPD officers found credit cards, debit cards, checks, opened mail, and unopened mail not in COOPER's name.  The LAPD officers also found fishing devices used to steal mail, a card reader, approximately $265 in counterfeit United States currency, and five of the six SUBJECT DEVICES.  An additional SUBJECT DEVICE was found on COOPER's person.

### IV. STATEMENT OF PROBABLE CAUSE

8.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. LAPD Officers Stop COOPER

9. From an arrest report prepared by LAPD Officer Yoon, I learned that, at approximately 3:40 a.m. on January 19, 2019, while on patrol in the Southwest area of Los Angeles, LAPD Officer Kang and Officer Yoon saw a man, later identified as COOPER, riding a bicycle with no front bicycle light. LAPD officers saw that COOPER had a backpack on his back. LAPD officers were aware of burglaries from motor vehicles that had occurred in the area in recent weeks. The LAPD officers conducted a pedestrian stop of COOPER for a violation of California Vehicle Code Section 21201(d)(1) (operating a bicycle during darkness without a front light).

10. LAPD Officer Kang conducted a patdown search of COOPER for weapons and felt a large stack of plastic cards in COOPER's rear right pocket. Officer Kang asked COOPER if his identification was located within the stack of plastic cards. COOPER replied, "No, it's not." Officer Kang asked COOPER if he was sure, and COOPER replied, "Yeah, I found those."

### B. COOPER Consents to a Search of His Backpack

11. From an arrest report prepared by LAPD Officer Yoon, I learned that Officer Yoon asked COOPER if he would provide verbal consent for Officer Yoon to search his backpack. COOPER consented.

12. Officer Yoon opened the middle zipper of the backpack and saw a clump of long, black, sticky, rope-like items tangled together. Based on prior mail theft arrests, Officer Yoon

recognized the tangled items as tools used to "fish" for mail from USPS mailboxes and secured mailboxes.

13. Inside the backpack, Officer Yoon also found unopened and opened mail and various bank cards and identification cards. Officer Yoon saw that many of the items from the backpack had different names that did not match COOPER's name and addresses that did not match COOPER's address. Officer Yoon noticed that some of COOPER's personal bank cards were mixed in with the items in the backpack.

14. Based on my review of the evidence and conversations with the LAPD officers, I learned that the counterfeit currency and five of the six SUBJECT DEVICES were found in the backpack. An additional SUBJECT DEVICE was found on COOPER's person.

15. The LAPD officers then arrested COOPER for a violation of California Penal Code Section 466 (Possession of Burglary Tools). During a search incident to his arrest, COOPER stated, "I have a pookie." Officer Kang recovered a glass methamphetamine pipe containing a white crystalline substance resembling methamphetamine from the right pocket of COOPER's inner jacket. COOPER was transported to the LAPD's Southwest Station for the pre-booking process where LAPD confirmed his identity.

### C. USPIS Investigation and COOPER's Statements

16. At approximately 8:10 a.m., I arrived at the LAPD's Southwest Station and met with LADP Officers Kang and Yoon to discuss their investigation, review the evidence collected, and conduct an interview of COOPER.

17. At approximately 8:35 a.m., Officer Yoon and I conducted a Mirandized interview of COOPER. In substance and in part:

   a. COOPER said that he gave the LAPD Officers permission to look in his backpack.

   b. COOPER said the SUBJECT DEVICES belonged to him.

   c. COOPER said that he recycles and that he grabbed the items he had when stopped by police in the back of a building by a park on Gibraltar and Pinafore Street. COOPER later said the items were against the wall near other trash.

   d. COOPER said that the fishing devices, checks, and credit cards were found all together.

   e. COOPER admitted that he went through the items. COOPER stated that he took "it" because he knows somebody who pays him for "it." When asked who pays him for it, COOPER replied "Janice." COOPER said that he picked the stuff up because he knows Janice wants it and that she would give him some methamphetamine. COOPER said Janice is in her 30s and is about 5 feet 7 inches tall, but COOPER could not provide any further details. COOPER said he usually meets Janice near Nicolet Street and Pinafore Street.

   f. COOPER said that he knows a guy who hangs out at the park who would call Janice when COOPER needed to get in contact with her. COOPER said that he does not know the guy's name. COOPER said that the guy told him that, if he found stuff like that, they would buy it from him. COOPER said that they would give him drugs for the items he found.

   g. COOPER said: "I'm wrong for having it. I should have just left it there."

   h. COOPER said he gives the checks or credit cards he finds to people because he knows he can get paid for it.

   i. I asked COOPER why people pay him for it, and he replied "because they're gonna do something with it."

  18. Based on conversations with the LAPD officers, I learned that the LAPD officers placed the plastic cards that were found during the patdown search of COOPER in the backpack. Accordingly, based on my review of the evidence and conversations with the LAPD officers, in his pocket and in the backpack, COOPER possessed approximately: 30 pieces of mail not bearing COOPER's name or address; 39 credit cards; 36 debit cards; three ATM cards; 14 gift cards; two California driver licenses; two California identification cards; a black folder containing various tax documents bearing full Social Security numbers, names, addresses and employment information belonging to persons other than COOPER; 22 checks, some of which had been altered; approximately $265 in counterfeit currency; paper stock to make counterfeit currency; two fishing devices used to steal mail; and a card reader device.[1]

## V. TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

  19. Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

---

[1] Based on my training and experience, I know that card readers are often used by mail thieves to read data encoded in credit, debit, and gift cards.

a. People who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value. Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b. It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

   c. Often times mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

   d. It is also common for mail and identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

   e. It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

   f. Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-

conspirators by phone, text, email, and social media, including sending photos.

      g.    Individuals engaged in mail and identity theft often use multiple digital devices.

      h.    It is a common practice for those involved in access device fraud or bank fraud to use either false identification or stolen real identification to make purchases with stolen access devices at retail stores in order to avoid detection and to complete the transaction. Those who engage in such fraud keep evidence of such retail transactions on their person.

      i.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers. Such equipment and software are often found on fraudsters' persons and on their digital devices.

      j.    Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

      k.    Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-

conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

20. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[2] As used herein, the term "digital device" includes the SUBJECT DEVICES any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

21. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

22. The search warrants request authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who was in possession of a device or had the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress COOPER's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of COOPER's face

with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

23. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

24. For all of the reasons described above, there is probable cause to believe that COOPER has committed a violation of Title 18, United States Code, Section 1708 (Possession of Stolen Mail). There is also probable cause that the items to be seized described in Attachment B-1 will be found in a search of the SUBJECT DEVICES described in Attachment A-1. There is also probable cause to believe that the items to be seized described in Attachment B-2 will be found in a search of the person described in Attachment A-2.

/s/
_____
JAMES KEENAN
United States Postal Inspector
United States Postal
Inspection Service

Subscribed to and sworn before me this 12th day of February, 2019.

CHARLES F. EICK
_____
UNITED STATES MAGISTRATE JUDGE